UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RUMSON WELLNESS LLC, a New Jersey limited liability company; DYLAN ROSS, an individual; and TAYLOR ROSS, an individual, | Case No. 3:25-cv-11931 |
| | **AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| FOUNTAINHEAD SBF LLC, a Florida limited liability company; COMMUNITY BANK & TRUST – WEST GEORGIA, a Georgia domestic bank; and PHOENIX LENDER SERVICES, LLC, a Georgia limited liability company, | |
| Defendants. | |

Plaintiffs Rumson Wellness LLC ("**Rumson Wellness**"), Dylan Ross, and Taylor Ross (together, "**Ross**"), for their Complaint against Defendants Fountainhead SBF LLC ("**Fountainhead**"), Community Bank & Trust – West Georgia ("**Community Bank**"), and Phoenix Lender Services, LLC ("**Phoenix**"), hereby allege as follows:

**INTRODUCTION**

1. This is a lawsuit seeking declaratory and equitable relief, as well as damages, arising from a Small Business Administration ("**SBA**") 7(a) loan (SBA Loan #94237982-03) for the principal amount of $923,000 that Defendants Fountainhead, Community Bank, and Phoenix originated, hold, service, and/or have otherwise sought to enforce (the "**Loan**"). The Loan was issued to Plaintiff Rumson Wellness and guaranteed by Ross for the purpose of funding what Plaintiffs believed at the time was a legitimate business opportunity with a Water Station Technology ("**WST**") franchise. The Loan was to be secured by 120 water vending machines

valued at $1,020,000 (the "**Equipment Collateral**") and a lien on the Ross's residence located in Rumson, New Jersey (the "**Ross Residence**"). Ultimately, the purpose of the Loan was entirely frustrated by the, then unknown by Plaintiffs, fraudulent nature of the underlying business. Accordingly, the Loan is void.

2.    Specifically, WST was a Ponzi scheme as detailed in multiple lawsuits spanning the nation (the "**WST Litigation**"), including, without limitation, *352 Capital GP LLC v. Wear, et al.*, Case No. 1:24-cv-05102-VEC (S.D.N.Y.), *MJT Water Technology, LLC et al. v. Wear, et al.*, Case No. 8:24-CV-01002 (C.D. Cal.), and *Alkaline Water Holdings, LLC et al. v. Wear, et al.*, Case No. 2:24-cv-01890-GAM (E.D. Penn.). The Ponzi scheme was so pervasive that in addition to the WST Litigation, multiple news articles have been written about the scam and at least one government agency, the Washington State Department of Financial Institutions, has brought a statement of charges against WST and Ryan Wear, its founder.

3.    This case is about Defendants' negligence and/or bad faith in approving and/or enforcing the Loan. Specifically, in addition to Fountainhead's failure to observe SBA regulations and to conduct appropriate due diligence and/or disclose information that would have been material to Plaintiffs' decisions to take out and guarantee the Loan, Community Bank and Phoenix have continued this bad faith and negligence by demanding that Plaintiffs repay the Loan, despite their awareness that the Loan resulted from fraud so pervasive that the entire purpose of the Loan has been frustrated.

4.    Plaintiffs have been placed in an unconscionable position. First, they invested in the WST Ponzi scheme due to Fountainhead's failure to (a) follow SBA regulations, (b) conduct appropriate due diligence, (c) disclose material information to Plaintiffs, or (d) even *verify the existence* of more than one million dollars' worth of equipment Fountainhead accepted as collateral for the Loan. Most recently, Plaintiffs were told by Community Bank and Phoenix that they alone had to bear the entire economic loss or face the loss of not just all the monthly payments they have timely made towards the worthless Loan, but also the foreclosure of the lien on the Ross Residence if they stopped making the Loan's monthly payments. Given that the lien clouded the title of the

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 2

Ross Residence, Ross had no choice but to pay off the Loan by making a payment to Community Bank in the amount of $794,371.12 on July 2, 2025 (the "**Loan Payoff**") in order to try to avoid any detrimental impact on the sale of the Ross Residence scheduled to close on August 7, 2025 (the "**Intended Ross Residence Sale**").

5.      Plaintiffs submit that: (a) the Loan is void; (b) Defendants have been unjustly enriched by Plaintiffs' payment of the Loan; (c) Defendants have breached their obligations owed to Plaintiffs; and (d) Defendants' actions have otherwise harmed Plaintiffs.

6.      Plaintiffs seek (a) a declaration that the Loan was and is void or voidable, (b) an order releasing the lien on the Ross Residence to the extent that the lien is not timely released following the Loan Payoff, (c) restitution for payments made on the Loan, and (d) damages for Defendants' misconduct, including their failure to comply with relevant SBA Standard Operating Procedures ("**SBA SOPs**"), their failure to conduct appropriate due diligence, failure to disclose material information, and their efforts to enforce the Loan, including threatening foreclosure of the lien on the Ross Residence and engaging in conduct which required Ross to make the Loan Payoff in an effort to mitigate any further losses due to the lien's potential detrimental impact on the Intended Ross Residence Sale.

## THE PARTIES

7.      Plaintiff Rumson Wellness LLC is a limited liability company formed under the laws of the State of New Jersey, with its principal place of business located in Rumson, New Jersey. Rumson Wellness is owned and operated by its two members, Plaintiffs Dylan and Taylor Ross.

8.      Plaintiff Dylan Ross is an individual residing in the State of New York, an owner of the real property located in New Jersey which secures the Loan, an owner and operator of Plaintiff Rumson Wellness, and the spouse of Plaintiff Taylor Ross. At the time of the Loan's execution, Plaintiff Dylan Ross resided in New Jersey.

9.      Plaintiff Taylor Ross is an individual residing in the State of New York, an owner of the real property located in New Jersey which secures the Loan, an owner and operator of

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 3

Plaintiff Rumson Wellness, and the spouse of Plaintiff Dylan Ross. At the time of the Loan's execution, Plaintiff Taylor Ross resided in New Jersey.

10.     Defendant Fountainhead SBF LLC is a limited liability company formed under the laws of the State of Florida, with its principal place of business located in Lake Mary, Florida. While Plaintiffs are unaware of the identities of Fountainhead's members at this time, upon information and belief, no member of Fountainhead is a citizen of New York or New Jersey based on Fountainhead's formation under the laws of the State of Florida and its principal place of business in Florida. Plaintiffs will seek to confirm the citizenship of Fountainhead's members through jurisdictional discovery. Upon information and belief, Fountainhead conducts business activities that are directed toward or have an impact in New Jersey or otherwise avails itself of the privilege of doing business in New Jersey by engaging in conduct including, but not limited to, issuing the Loan which is: (a) governed by New Jersey law; (b) a contract with parties who were New Jersey residents at the time of its execution; and (c) secured by real property located in New Jersey, specifically, the Ross Residence.

11.     Defendant Community Bank & Trust – West Georgia is a domestic bank formed under the laws of the State of Georgia, with its principal place of business located in LaGrange, Georgia. Upon information and belief, Community Bank conducts business activities that are directed towards or have an impact in New Jersey or otherwise avails itself of the privilege of doing business in New Jersey by engaging in conduct including, but not limited to, acquiring the Loan which is: (a) governed by New Jersey law; (b) a contract with parties who were New Jersey residents at the time of its execution; and (c) secured by real property located in New Jersey, specifically, the Ross Residence.

12.     Defendant Phoenix Lender Services, LLC is a limited liability company formed under the law of the State of Georgia, with its principal place of business located in LaGrange, Georgia. While Plaintiffs are unaware of the identities of Phoenix's members at this time, upon information and belief, no member of Phoenix is a citizen of New York or New Jersey based on Phoenix's formation under the laws of the State of Georgia and its principal place of business in

Georgia. Plaintiffs will seek to confirm the citizenship of Phoenix's members through jurisdictional discovery. Upon information and belief, Phoenix conducts business activities that are directed towards or have an impact in New Jersey or otherwise avails itself of the privilege of doing business in New Jersey by engaging in conduct including, but not limited to, servicing the Loan which is: (a) governed by New Jersey law; (b) a contract with parties who were New Jersey residents at the time of its execution; and (c) secured by real property located in New Jersey, specifically, the Ross Residence.

13.    Upon information and belief, each of the Defendants was the agent of each of the other Defendants and, in engaging in the actions alleged herein, was acting within the course and scope of such agency.

## JURISDICTION AND VENUE

14.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states. Plaintiff Rumson Wellness is a citizen of New York, and, at the time of the Loan's execution, was a citizen of New Jersey. Plaintiffs Ross are currently citizens of New York, and, at the time of the Loan's execution, were citizens of New Jersey. Defendant Fountainhead is a citizen of Florida; Defendant Community Bank is a citizen of Georgia; and Defendant Phoenix is a citizen of Georgia.

15.    This Court has personal jurisdiction over Defendants because Defendants purposefully directed their activities to New Jersey by originating, holding, or servicing the Loan for Rumson Wellness, a then New Jersey LLC, secured, in part, by real property located in New Jersey owned by parties who were New Jersey residents at the time of the Loan's execution (*i.e.*, the Ross Residence). The Loan is governed by New Jersey law. Defendants' conduct was directed towards and actually felt in New Jersey. Further, Defendants knew or should have known their conduct would harm Plaintiffs in New Jersey, where real property securing the Loan – the Ross Residence – is located, and where the Loan was executed when Plaintiffs were New Jersey residents.

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 5

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred, and a substantial part of the injuries suffered by Plaintiffs were suffered, in this judicial district.

## FACTUAL ALLEGATIONS

### The Fraudulent WST Franchise and the Loan's Origination

17.    On or about May 24, 2021, Rumson Wellness entered into a Purchase Order Agreement with WST to purchase water vending machines in connection with a franchise business. WST represented that these water vending machines would be installed at viable locations, generating revenue for Rumson Wellness.

18.    To fund the WST franchise, Ross paid $170,000 for 20 water vending machines and Rumson Wellness applied for an SBA 7(a) loan through Fountainhead for the principal amount of $923,000, with most of the Loan (approximately $850,000) being used to pay for an additional 100 water vending machines. Fountainhead approved the Loan on July 30, 2021, with the Loan secured by the Equipment Collateral and a lien on the Ross Residence. The loan agreement ("**Loan Agreement**") specified the Loan's purpose as being for "long term financing for the start-up operations of a Water Station Technology Franchise Business".

19.    Ross intended to actively manage and operate the Rumson Wellness franchise. To ensure that their WST franchise was a success, Plaintiffs performed due diligence, including reference checks, speaking to current franchisors, physically examining the technology of water vending machines installed for other franchise owners, and scouting locations of current and potential future water vending machines both nationwide and internationally. Plaintiffs also spent significant time with Wear and Tyler Sadak, one of Wear's WST colleagues, so that they could understand the business model and operational aspects of WST. Plaintiffs were assured by Wear and Sadak that Plaintiffs would have the ability to actively monitor and manage their WST franchise and that the business would have low overhead, positive cash flow, and steady revenue. The business plan developed by Plaintiffs was to include the continuous reinvestment of revenue into additional water vending machines and the exploration of expansion opportunities into new

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 6

geographical areas, including areas with limited access to clean water.

20. A core tenet of the WST opportunity, and crucial for active monitoring of WST success, was the proprietary technology WST claimed to possess to help franchisees accurately monitor individual station performance. However, WST never gave Plaintiffs access to this essential operational tool, directly impeding their ability to actively monitor the franchise.

21. The inability to monitor WST was not alarming to Plaintiffs initially as they received reasonably consistent money from WST for the first two years. However, in mid-2023, the promised steady revenue became increasingly inconsistent and Wear became increasingly challenging to get ahold of before going completely silent. Concerned, Plaintiffs began to speak with other WST franchise owners and learned that they were experiencing the same issues and that some had even made claims against Wear and WST. Through these discussions with the other WST franchise owners, Plaintiffs became aware of the massive scale of the fraud perpetuated by Wear and WST predating the Loan. After learning of the fraud, Plaintiffs investigated the locations where Wear had claimed that WST water vending machines had been placed for Rumson Wellness and discovered that not a single vending machine existed.

22. Unbeknownst to Plaintiffs, as discussed in the WST Litigation, Wear and WST had been operating a Ponzi scheme since at least 2018, misrepresenting machine installations and profits to induce franchisees like Plaintiffs to purchase franchises that were worthless. Ultimately, as no operational machines were installed for Rumson Wellness, the franchise was worthless and the Loan's fundamental purpose of funding a legitimate business was frustrated. As the Equipment Collateral securing the Loan was non-existent, the Ross Residence became the unintended primary source of collateral for the Loan.

23. The scope of the fraud was a shock to Plaintiffs, who had relied heavily on Fountainhead's assessment of fraud risk during the underwriting process for the Loan. Plaintiffs reasonably believed that Fountainhead, as a sophisticated SBA lender, would perform the necessary due diligence to identify, disclose, and mitigate any risks with the Loan. As a professional SBA lender with access to financial data and industry resources, Fountainhead was

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 7

uniquely positioned to detect WST's fraudulent scheme, unlike Plaintiffs, who lacked such expertise or access. When Fountainhead approved the Loan, Plaintiffs reasonably believed that Fountainhead had conducted the requisite due diligence and had verified the Equipment Collateral, and that the Loan's approval was assurance that the WST franchise was a legitimate and viable business opportunity.

24.     Fountainhead's failure to verify critical operational aspects, such as water vending machine installations, access to monitoring technology, and even the existence of the Equipment Collateral, gave Plaintiffs false assurance that the WST franchise business was legitimate, leading to Plaintiffs' delayed discovery that the WST franchise was a sham.

**Fountainhead's Negligent Due Diligence**

25.     At all times relevant, Fountainhead was subject to rules and policies pertaining to SBA loans, including, without limitation, those set forth in SBA SOP 50 10 6 (effective October 1, 2020).

26.     Pursuant to SBA SOP 50 10 6, Fountainhead was required to, without limitation, verify franchise eligibility, document due diligence, conduct prudent credit analysis, scrutinize financials, and assess collateral adequacy.

27.     Shortly before the Loan's origination, on May 14, 2021, Fountainhead held itself out to customers on its website as "having extensive SBA loan experience" with a team "involved in financing over $24 billion in total projects . . . across all 50 states." Fountainhead also claimed to be "founded by the most well-known, awarded, and experienced team in the SBA industry, so our speed, specialization, creativity and expertise are second to none."

28.     Fountainhead also promised that each customer was "a business owner with a story and we always take time to understand your story and provide you with the best loan solution for your precise situation," that customers would receive "responsiveness; personalized service; and the attention to detail that you deserve," and that Fountainhead would "make common sense decisions in an industry often devoid of them for fear of regulatory ramifications."

29.     Further, on Fountainhead's website as of May 27, 2025, Fountainhead claimed that

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 8

it: (a) helps small to midsize businesses finance their growth through SBA loans; (b) funds only three types of loans "again and again and again" with this specialization helping Fountainhead "make sure your business gets exactly what it needs"; (c) is the nation's leading nonbank small business lender, having closed more than 301,000 SBA loans totaling more than $28 trillion as of January 1, 2023; and (d) pays "attention to detail" and employs loan specialists who will "hold your hand (if need be), and continuously update you, leaving little room for worry or stress."

30.    Despite the representations and promises made to Fountainhead's customers, including Plaintiffs, and the requirements set forth in SBA SOP 50 10 6, Fountainhead failed to verify franchise eligibility, document due diligence, conduct prudent credit analysis, scrutinize financials, or assess collateral adequacy. Instead, Fountainhead relied on WST's unverified representations without independent confirmation before approving the Loan for what was ultimately a sham business opportunity.

31.    Specifically, Fountainhead accepted a delayed list of Equipment Collateral (which included purported, but non-existent, water vending machine locations and serial numbers) from WST months after closing and failed to take the steps necessary to verify Equipment Collateral installations or WST's financial viability prior to closing. Had Fountainhead conducted reasonable site visits, verified third-party financial statements, performed UCC-1 searches on the Equipment Collateral, independently confirmed the operational status of other WST franchises, or otherwise engaged in prudent lending practices with respect to the Loan, Fountainhead would have discovered WST's pervasive fraud, which predated the Loan's origination and included actions such as furnishing fraudulent water vending machine lists to lenders.

32.    Based on the representations made by Fountainhead, Plaintiffs reasonably and justifiably relied on Fountainhead to guide and support them through the process of underwriting and closing the Loan and to disclose any material information bearing on the transaction.

33.    Based on the representations made by Fountainhead and Fountainhead's processing and approval of an SBA 7(a) loan that was subject to extensive SBA requirements, Fountainhead also led Plaintiffs to reasonably and justifiably believe that: (a) Fountainhead would perform the

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 9

due diligence required by the SBA; and (b) the underlying business purpose for the Loan was a legitimate business opportunity and eligible for SBA financing.

34.     At all times material, Fountainhead had specialized knowledge and expertise that Plaintiffs relied on in entering the Loan. Upon information and belief, at all times material, Fountainhead also had superior access to information relating to the Loan.

35.     Additionally, Plaintiffs' decision to enter the Loan was premised on the expectation that the Loan's proceeds would, at least in part, be used to purchase Equipment Collateral that they would then own and that would secure the Loan. This was fundamental to the validity and viability of the Loan.

36.     Had Fountainhead performed adequate due diligence and complied with the requirements of SBA SOP 50 10 6, it would have discovered the fraud inherent in WST and, in turn, the Loan.

37.     Fountainhead made representations about its performance as an experienced SBA lender that would—presumably—comply with all rules and policies pertaining to SBA loans, including those set forth in SBA SOP 50 10 6, and otherwise engage in prudent lending practices, including conducting appropriate due diligence and investigating the adequacy of the Equipment Collateral. Fountainhead's representations induced Plaintiffs to not just invest in the WST franchise, but also induced Ross to personally guarantee the Loan, placing the Ross Residence at significant risk. All of this caused, and is continuing to cause, substantial financial harm to Plaintiffs.

**Loan Assignment and Defendants' Bad Faith Enforcement**

38.     On or about January 31, 2024, Fountainhead assigned the Loan to Community Bank, with Phoenix as the servicing agent. As a result, upon information and belief, Community Bank and Phoenix inherited Fountainhead's obligations and liabilities under the Loan Agreement.

39.     On Community Bank's website, as of July 8, 2025, Community Bank claimed to: (a) "have a knowledgeable team of commercial lending specialists focused solely on SBA small business loans"; (b) have "unmatched SBA loan expertise" due to "commercial lending

specialists" with "deep expertise in all types of SBA commercial loans"; (c) "provide the service and trusted guidance businesses need"; and (d) "walk you through everything you need to do to get from request to approval".

40.     On Phoenix's website, as of May 27, 2025, Phoenix claimed to: (a) have a "proven track record as a lending loan servicer"; (b) possess "deep knowledge" to allow borrowers to access "SBA lending solutions essential to your success and the prosperity of your community"; and (c) have "expertise across eight critical areas" of lender services, including, most relevantly, "SBA loan underwriting", "servicing and operations", and "loan audits".

41.     Despite the invalidity of the Loan Agreement, personal guaranties, and any other documents Plaintiffs were induced to sign related to the Loan, Community Bank and Phoenix continued to enforce the Loan, demanding full repayment of the Loan balance and threatening foreclosure on the lien on the Ross Residence. The threatened foreclosure of the lien on the Ross Residence was particularly alarming for Plaintiffs as they timely made all payments under the Loan – and indeed paid off the Loan in full – despite the Loan being tainted by the WST franchisors' fraud and misconduct.

42.     At all relevant times, Community Bank and Phoenix, in their roles as assignee and servicer of an SBA loan, knew or should have known of Fountainhead's deficient due diligence, particularly given public information regarding the WST fraud, including the WST Litigation and news articles, and the non-existence of the Equipment Collateral.

43.     Upon information and belief, and through publicly available sources such as the WST Litigation and news articles, Community Bank and Phoenix had actual or constructive knowledge of WST's widespread fraud and the fraudulent nature of the underlying business venture funded by the Loan.

44.     In April 2025, Plaintiffs requested a reduction of the Loan's principal, a lump-sum payoff, and a release of the lien on the Ross Residence, based on WST's fraud and Fountainhead's negligent due diligence, which falsely assured Plaintiffs that WST was a viable franchise. Phoenix, on behalf of Community Bank, rejected this request, falsely claiming that a write-down of the Loan

would be an "offer in compromise" that required liquidation of the Ross Residence.

45.     Further, Phoenix insisted that Plaintiffs continue to make Loan payments under the threat of legal action and foreclosure of the lien on the Ross Residence.

46.     The unwarranted threat of foreclosure and the lien clouding the title of the Ross Residence reasonably compelled Plaintiffs to believe that in order to mitigate further losses caused by the void Loan, including, but not limited to, the lien's potential imminent detrimental impact on the Intended Ross Residence Sale, Plaintiffs had no option but to make the Loan Payoff, thereby releasing the lien on the Ross Residence. Accordingly, on July 2, 2025, Plaintiffs made the Loan Payoff per directions provided by Community Bank and Phoenix.

**Plaintiffs' Harm and the Ongoing Threatened Harm**

47.     As a result of WST's fraud and Defendants' actions, Rumson Wellness has incurred an almost-million-dollar Loan obligation, paid approximately $1.4 million for the Loan, and received no operational franchise or Equipment Collateral, rendering the business worthless. Plaintiffs also face the possibility that, despite having made the Loan Payoff per instructions provided by Community Bank and Phoenix, an untimely processing of the Loan Payoff and immediate release of the lien on the Ross Residence could imminently detrimentally impact the Intended Ross Residence Sale.

48.     Defendants' refusal to negotiate in good faith and continued efforts to enforce the Loan, despite Plaintiffs' good faith performance and diligence in seeking resolution, exacerbated Plaintiffs' harm. The continued enforcement of a loan used to fund a nonexistent business, which Defendants knew or should have known was a sham, is fundamentally inequitable and constitutes bad faith.

49.     Absent judicial relief, Defendants will unjustly retain payments made under the Loan, and, potentially, failure by Phoenix and Community Bank to immediately release the lien could imminently and detrimentally impact the Intended Ross Residence Sale, all of which would cause Plaintiffs considerable harm.

50.     Declaratory relief, restitution, and damages are necessary to remedy Defendants'

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 12

misconduct and protect Plaintiffs' rights.

**Invalidity and Unenforceability of Jury Trial Waiver**

51.     Plaintiffs acknowledge that the Loan Agreement contains a purported waiver of the right to a jury trial. However, Plaintiffs assert that this waiver is unenforceable because:

(a) The waiver's scope is limited to disputes "arising out of, under or in connection with this Agreement or the transactions contemplated herein." Plaintiffs' claims for unjust enrichment and negligent misrepresentation arise from Defendants' independent tort and equitable duties, extending beyond the mere interpretation or breach of contractual terms.

(b) The waiver provision itself is unconscionable. Given the fraudulent nature of the underlying WST franchise, which was unknowable to Plaintiffs but should have been discovered by Fountainhead, and the overall circumstances surrounding the Loan's origination and enforcement, the enforcement of a waiver of a fundamental constitutional right to a jury trial would be oppressive and contrary to public policy.

(c) The entire Loan Agreement, including the jury waiver provision, was procured through negligent misrepresentation, as detailed herein, rendering the entire contract voidable, including any purported waiver of rights contained therein. Plaintiffs would not have entered into the Loan Agreement, or agreed to any of its terms, had they known the underlying business was a sham Ponzi scheme.

**FIRST CAUSE OF ACTION**

**(Negligent Misrepresentation – Against All Defendants)**

52.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-51 as if fully set forth herein.

53.     Defendants owed Plaintiffs a duty of exercising reasonable care and competence in complying with all applicant rules and regulations, including the SBA SOPs, and to conduct themselves in relation to the Loan and Plaintiffs in a manner expected of SBA-approved lenders,

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 13

assignees, and servicers of similar standing, experience, and expertise. Fountainhead further owed Plaintiffs a duty of exercising reasonable care and competence in performing necessary due diligence to identify and mitigate any risks with the Loan, including by verifying franchise eligibility, financials, and Equipment Collateral before approving the Loan. Additionally, Community Bank and Phoenix, as assignee and servicer, had a duty of exercising reasonable care and competence in investigating WST's fraud before enforcing the Loan, given their actual or constructive knowledge of Fountainhead's due diligence failures and the non-existence of the Equipment Collateral.

54.    Fountainhead, in its role as an SBA lender, negligently made incorrect statements, negligently failed to disclose material information, or supplied false information to Plaintiffs regarding the viability and legitimacy of the WST franchise. By approving and disbursing the Loan for a "Water Station Technology Franchise Business" without exercising reasonable care or competence in verifying the Equipment Collateral, scrutinizing financials, or investigating readily discoverable indicia of fraud as required by SBA SOP 50 10 6 and as would be expected from a lender of the standing and experience that Fountainhead claimed to possess, Fountainhead implicitly represented that WST was a legitimate and viable business eligible for SBA financing.

55.    Community Bank and Phoenix perpetuated this negligent misrepresentation by continuing to enforce the Loan and demanding payment without investigating WST's widespread fraud, despite their actual or constructive knowledge of the fraud and Fountainhead's initial due diligence failures, thereby reaffirming the implicit representation of the legitimacy of the business opportunity connected to the Loan.

56.    Defendants, including Fountainhead, knew or should have known that these representations regarding WST's legitimacy were false or could not be substantiated, as WST's pervasive fraud significantly predated the Loan. Fountainhead's failure to conduct timely and thorough due diligence, as required by its role as an SBA lender, constituted negligence.

57.    Plaintiffs reasonably and justifiably relied on Defendants' implicit and explicit representations regarding the legitimacy and viability of the WST franchise by investing in the

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 14

worthless WST franchise and executing the Loan Agreement. Ross also justifiably relied on these representations by personally guaranteeing the Loan and allowing a lien to be placed against the Ross Residence under the belief that: (a) Rumson Wellness would receive a legitimate, operating franchise that would raise revenue more than sufficient to pay off the Loan; and (b) the Equipment Collateral existed and would serve as the primary collateral for the Loan. This justifiable reliance directly caused Plaintiffs substantial financial losses, interfered with Ross's ability to enjoy the full benefits of a clear title to the Ross Residence, and currently presents an imminent risk of detrimental impact on the Intended Ross Residence Sale.

58.     Plaintiffs are entitled to damages for their losses, rescission of the Loan, release of the lien on the Ross Residence to the extent it is not timely released following the Loan Payoff, and/or other equitable relief to remedy Defendants' negligent misrepresentation.

**SECOND CAUSE OF ACTION**

**(Breach of Implied Covenant of Good Faith and Fair Dealing – Against All Defendants)**

59.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-58 as if fully set forth herein.

60.     The Loan Agreement between Rumson Wellness and Fountainhead and guaranteed by Ross, assigned to Community Bank and serviced by Phoenix, includes an implied covenant of good faith and fair dealing, requiring Defendants to act honestly and reasonably to fulfill the Loan's purpose of funding a viable WST franchise business.

61.     Plaintiffs performed their obligations required under the Loan Agreement.

62.     Defendants breached the implied covenant of good faith and fair dealing by acting in bad faith with the intent to deprive Plaintiffs of the Loan's reasonably expected benefits, namely, a functioning WST franchise capable of generating revenue to repay the Loan.

63.     With respect to Fountainhead, Fountainhead acted with bad faith by: (a) approving the Loan without conducting the necessary due diligence which would have allowed Fountainhead to identify, disclose and mitigate any risks with the Loan; and (b) failing to comply with all applicable rules and regulations, including SBA SOPs. Fountainhead's failure to comply with the

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 15

covenant of good faith and fair dealing placed Plaintiffs at risk of funding a sham enterprise, thereby undermining the Loan's purpose.

64.    Community Bank and Phoenix acted with bad faith by enforcing the Loan and threatening foreclosure of the lien on the Ross Residence, despite actual or constructive knowledge of WST's fraud and Fountainhead's deficient due diligence and the nonexistence of the Equipment Collateral. Their pursuit of payments for a nonexistent franchise was unreasonable and intended to extract benefits to which they were not entitled, denying Plaintiffs the Loan's intended bargain.

65.    As a proximate result of Defendants' breaches of the covenant of good faith and fair dealing, Plaintiffs were deprived of the Loan's reasonably expected benefits, lost all payments made towards a nonexistent franchise, incurred a substantial Loan obligation for a worthless asset, suffered interference with Ross's ability to enjoy the full benefits of a clear title to the Ross Residence, and are at an imminent risk of the lien on the Ross Residence detrimentally impacting the Intended Ross Residence Sale, all of which cause Plaintiffs significant financial harm and stress.

66.    Plaintiffs are entitled to damages for their losses, rescission of the Loan, release of the lien on the Ross Residence, and/or other equitable relief to remedy Defendants' breach.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment – Against All Defendants)

67.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-66 as if fully set forth herein.

68.    Defendants have received a benefit from Plaintiffs in the form of principal and interest payments on the Loan and the lien on the Ross Residence. The retention of these benefits by Defendants, where the Loan funded a fraudulent Ponzi scheme and yielded no legitimate business opportunity to Plaintiffs, would be unjust, particularly given the underlying fraud and Fountainhead's negligence in failing to perform the requisite due diligence that would have uncovered said fraud.

69.    At the time Plaintiffs conferred these benefits by agreeing to make payments on the

Loan and by pledging the Ross Residence as collateral securing the Loan, Plaintiffs reasonably expected remuneration in the form of a viable franchise business and receipt of the Equipment Collateral. Defendants, including Fountainhead, knew or should have known, through the exercise of reasonable diligence, that the WST franchise was a sham. Community Bank and Phoenix, as assignees, inherited this unjust benefit and continued to seek its retention despite their actual or constructive knowledge of the fraud and the worthlessness of the underlying venture.

70. Plaintiffs are entitled to restitution of all payments made under the Loan, release of the lien on the Ross Residence to the extent that it is not timely released after the Loan Payoff, and/or other equitable relief to prevent Defendants' unjust enrichment.

**FOURTH CAUSE OF ACTION**

**(Declaratory Relief – Against All Defendants)**

71. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-70 as if fully set forth herein.

72. An actual controversy exists between Plaintiffs and Defendants regarding the parties' rights and obligations relating to the Loan and its subsequent payoff. Plaintiffs contend the Loan is void or voidable and that Defendants have acted negligently, have breached the covenant of good faith and fair dealing, and have been unjustly enriched by payment of the Loan, and that Plaintiffs are entitled to restitution of all sums paid to Defendants under this voidable agreement, while Defendants assert a right to retain those funds. Plaintiffs further contend that Phoenix and Community Bank have an immediate obligation to discharge the associated lien to prevent imminent detrimental impact on the Intended Ross Residence Sale, while, upon information and belief, Phoenix and Community Bank dispute any obligation to discharge the lien on an expedited basis.

73. This controversy is definite and concrete, touching the tangible interests of Plaintiffs, who have suffered financial harm from their payment of the Loan in full to Defendants, despite the Loan's unenforceability, and the imminent threat of detrimental impact on the Intended Ross Residence Sale should Phoenix and Community Bank fail to immediately and lawfully

discharge the lien of record prior to the August 7, 2025 closing.

74. The controversy is adversarial, as Plaintiffs and Defendants have directly opposing legal positions regarding the validity and enforceability of the Loan. Under the NJ Declaratory Judgment Act (N.J.S.A. 2A:16-50 *et seq.*) and federal law (28 U.S.C. § 2201), this Court may declare the parties' rights.

75. A declaration from this Court will establish Plaintiffs' right to full restitution of all amounts paid under the Loan, and resolve uncertainty and insecurity surrounding Phoenix's and Community Bank's obligation to immediately discharge the associated lien to prevent the potentially imminent interference with the Intended Ross Residence Sale.

76. The Loan is voidable under New Jersey law because WST's misrepresentations constituted fraud in the inducement and the underlying business the Loan was intended to fund was a sham Ponzi scheme. Accordingly, the fundamental purpose of the Loan was frustrated, rendering the consideration received by Plaintiffs worthless and the Loan Agreement itself fundamentally unenforceable from its inception. Furthermore, because the essential bargained-for exchange in the Loan failed, the Loan is voidable or subject to rescission.

77. Plaintiffs have no other adequate remedy at law to address the ongoing harm caused by the unenforceable Loan and the imminent and detrimental threat to the Intended Ross Residence Sale. Declaratory relief is necessary to clarify the parties' rights and obligations with respect to the time-sensitive discharge of the lien, the failure of which threatens immediate and irreparable harm to the Intended Ross Residence Sale. The issue is ripe for decision, as the facts underlying the dispute are fully developed, and the threat of detrimental impact on the Intended Ross Residence Sale is imminent.

78. Plaintiffs are entitled to a declaration that the Loan was and is void and fundamentally unenforceable, that Plaintiffs are entitled to restitution of all payment made, and that the lien on the Ross Residence was void and is void to the extent that the lien is not immediately released after the Loan Payoff, thereby preventing imminent detrimental impact on the Intended Ross Residence Sale and resolving the controversy.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor on each of the claims stated herein and against Defendants, and that they be awarded relief that includes, but is not limited to, an order:

1.      For any and all legal or equitable remedies available under state law, including, without limitation, recission and reformation;

2.      For awards of damages against Defendants in an amount to be determined at trial but expected to be no less than $1.4 million;

3.      For an order directing Defendants to disgorge and return all payments made by Plaintiffs, including all principal and interest payments made, as restitution for unjust enrichment;

4.      Declaring the Loan void, unenforceable, and/or subject to rescission due to WST's fraud, the frustration of the Loan's purpose, and/or Defendants' negligence and breach of the covenant of good faith and fair dealing, and ordering that Phoenix and Community Bank release the lien on the Ross Residence to the extent that it is not immediately released;

5.      Awarding Plaintiffs their full costs of suit, including but not limited to, reasonable attorneys' fees, as permitted by law;

6.      Awarding prejudgment interest as permitted by law;

7.      For joint and several liability under applicable law; and

8.      For such other relief as the Court deems just and proper.

Dated this 10th day of July, 2025.                    Respectfully submitted,

By: _s/ James T. Prusinowski_
     James T. Prusinowski
     THE CHILLA BUSINESS COUNSEL, LLC
     268 South Street
     Morristown, New Jersey 07960
     Telephone: (973) 660-1095

     Ashley J. McDonald (*pro hac vice*)
     Randall Moeller (*pro hac vice*)

     *Attorneys for Plaintiffs*

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 19

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.


DATED: July 10, 2025                    *s/ James T. Prusinowski*

James T. Prusinowski

*Attorneys for Plaintiffs*

AMENDED COMPLAINT
(Case No. 3:25-cv-11931) – 20