**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| RUMSON WELLNESS LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FOUNTAINHEAD SBF LLC, *et al.*,<br><br>Defendants. | Civil Action No. 25-11931 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Fountainhead SBF LLC ("Fountainhead"), Community Bank & Trust – West Georgia ("Community Bank"), and Phoenix Lender Services, LLC's ("Phoenix," and collectively with Fountainhead and Community Bank, "Defendants") Motion to Dismiss (ECF No. 23) Plaintiffs Rumson Wellness LLC ("Rumson Wellness"), Dylan Ross ("Dylan"), and Taylor Ross's ("Taylor," and collectively with Rumson Wellness and Dylan, "Plaintiffs") Amended Complaint (ECF No. 15). Plaintiffs opposed (ECF No. 26), and Defendants replied (ECF No. 27). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons stated below, the Court grants Defendants' Motion to Dismiss.

I.    <u>BACKGROUND</u>[1]

A.    **Factual Background**

On or about May 24, 2021, Rumson Wellness "entered into a purchase order agreement with [Water Station Technology ("WST")] to purchase water vending machines" in connection with a WST franchise. (Am. Compl. ¶ 17, ECF No. 15.) WST assured the machines would be installed at "viable locations, generating revenue for Rumson Wellness." (*Id.*) To finance the WST franchise, Plaintiffs Dylan and Taylor invested $170,000 for twenty water vending machines. (*Id.* ¶ 18.) Rumson Wellness additionally applied for a Small Business Administration ("SBA") 7(a) loan through Fountainhead for the principal amount of $923,000 (the "Loan"), with most of the Loan (approximately $850,000) being used for an additional one hundred water vending machines. (*Id.*) Fountainhead approved the Loan on July 30, 2021, with the Loan secured by the one-hundred-and-twenty water vending machines valued at $1,020,000 (the "Equipment Collateral") and a lien on the residence of Dylan and Taylor located in Rumson, New Jersey (the "Ross Residence"). (*Id.* ¶¶ 1, 18.) The loan agreement (the "Loan Agreement") specified "long term financing for the start-up operations of a [WST] Franchise business" as the Loan's purpose. (*Id.* ¶ 18.)

Unbeknownst to Plaintiffs at the time, WST was a Ponzi scheme. (*Id.* ¶¶ 2, 22.)  A core tenet of the WST opportunity "was the proprietary technology WST claimed to possess to help franchisees accurately monitor individual station performance." (*Id.* ¶ 20.) Although WST never gave Plaintiffs access to this essential operational tool, directly impeding their ability to actively monitor the franchise, Plaintiffs were initially not alarmed because they received reasonably

---

[1] For the purpose of considering the instant motion, the Court accepts all factual allegations in the Amended Complaint as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

consistent money from WST for their first two years of franchise ownership. (*Id.* ¶¶ 20-21.) However, in mid-2023 revenue became inconsistent and WST's founder, Ryan Wear ("Wear"), became challenging to communicate with before going completely silent. (*Id.* ¶ 21.) Concerned, Plaintiffs spoke with other WST franchise owners and became aware of a massive fraud perpetuated by Wear and WST predating the Loan. (*Id.*)

Specifically, Wear and WST had been operating a Ponzi scheme since at least 2018 in which they misrepresented machine installations and profits to induce franchisees like Plaintiffs to purchase worthless franchises. (*Id.* ¶ 22.) Due to the massive scale of the fraud, nationwide lawsuits have been filed against Wear and WST (the "WST Litigation"), multiple news agencies have reported on the scheme, and at least one government agency, the Washington State Department of Financial Institutions, has brought a statement of charges against WST and Wear. (*Id.* ¶ 2.)

After learning of the fraud, Plaintiffs investigated the locations where water vending machines were to have been placed for Rumson Wellness and "discovered that not a single vending machine existed." (*Id.* ¶ 21.) As no Equipment Collateral existed, the franchise was worthless and the Loan's fundamental purpose of funding a legitimate business was frustrated, and the Ross Residence became the unintended primary source of collateral for the Loan. (*Id.* ¶ 22.)

Plaintiffs allege that they relied on Fountainhead's fraud risk assessment during the Loan's underwriting process. (*Id.* ¶ 23.) Plaintiffs "believed that Fountainhead, as a sophisticated SBA lender would perform the necessary due diligence to identify, disclose, and mitigate any risks with the Loan." (*Id.*) Plaintiffs allege that "[a]s a professional SBA lender with access to financial data and industry resources, Fountainhead was uniquely positioned to detect WST's . . . scheme[.]" (*Id.*) Fountainhead "fail[ed] to verify critical operational aspects, such as water vending machine installations, access to monitoring technology, and . . . the existence of the Equipment Collateral"

which "gave Plaintiffs false assurance that the WST franchise business was legitimate, leading to Plaintiffs' delayed discovery that the WST franchise was a sham." (*Id.* ¶ 24.)

Fountainhead was subject to the rules and policies pertaining to SBA loans, including those set forth in the SBA's Standard Operating Procedures ("SOP"), which required it to "verify franchise eligibility, document due diligence, conduct prudent credit analysis, scrutinize financials, and assess collateral adequacy." (*Id.* ¶¶ 25-26.) Plaintiffs allege that Fountainhead "held itself out to customers on its website as 'having extensive SBA loan experience' with a team 'involved in financing over $24 billion in total projects . . . across all [fifty] states." (*Id.* ¶ 27.) Fountainhead, moreover, "claimed to be 'founded by the most well-known, awarded, and experienced team in the SBA industry, so [its] speed, specialization, creativity and expertise [was] second to none.'" (*Id.*)

Fountainhead "promised that each customer was 'a business owner with a story and [that it would] always take time to understand [its customers'] story and provide [its customers] with the best loan solution for [their] precise situation,'" and "that customers would receive 'responsiveness; personalized service; and the attention to detail that [they] deserve[.]'" (*Id.* ¶ 28.) Fountainhead also promised that it "would 'make common sense decisions in an industry often devoid of them for fear of regulatory ramifications.'" (*Id.*)

Fountainhead "failed to verify franchise eligibility, document due diligence, conduct prudent credit analysis, scrutinize financials, or assess collateral adequacy[,]" and instead, "relied on WST's unverified representations without independent confirmation before approving the Loan for what was ultimately a sham business opportunity." (*Id.* ¶ 30.) Fountainhead "accepted a delayed list of Equipment Collateral . . . from WST months after closing and failed to take the steps necessary to verify Equipment Collateral installations or WST's financial viability prior to

4

closing." (*Id.* ¶ 31.) Plaintiffs allege that "[h]ad Fountainhead conducted reasonable site visits, verified third-party financial statements, performed [Uniform Commercial Code ("UCC")] searches on the Equipment Collateral, independently confirmed the operational status of other WST franchises, or otherwise engaged in prudent lending practices with respect to the Loan[,]" it would have "discovered WST's pervasive fraud, which predated the Loan's origination and included actions such as furnishing fraudulent water vending machine lists to lenders." (*Id.* ¶ 31.) "Plaintiffs' decision to enter the Loan was premised on the expectation that the Loan's proceeds would, at least in part, be used to purchase Equipment Collateral that they would then own and that would secure the Loan." (*Id.* ¶ 35.) "Fountainhead made representations about its performance as an experienced SBA lender that [it] would . . . comply with all rules and policies pertaining to SBA loans[.]" (*Id.* ¶ 37.)

"On or about January 31, 2024, Fountainhead assigned the Loan to Community Bank, with Phoenix as the servicing agent[,]" and as a result, "Community Bank and Phoenix inherited Fountainhead's obligations and liabilities under the Loan Agreement." (*Id.* ¶ 38.) "Community Bank and Phoenix [have] continued to enforce the Loan, demanding full repayment of the Loan balance and threatening foreclosure on the lien on the Ross Residence." (*Id.* ¶ 41.)

"In April 2025, Plaintiffs requested a reduction of the Loan's principal, a lump-sum payoff, and a release of the lien on the Ross Residence, based on WST's fraud and Fountainhead's negligent due diligence[.]" (*Id.* ¶ 44.) "Phoenix, on behalf of Community Bank, rejected this request," and claimed "that a write-down of the Loan would be an 'offer in compromise' that required liquidation of the Ross Residence." (*Id.*) "Phoenix insisted that Plaintiffs continue to make Loan payments under the threat of legal action and foreclosure of the lien on the Ross Residence." (*Id.* ¶ 45.) Plaintiffs, accordingly, "made the Loan Payoff per directions provided by Community

Bank and Phoenix" (*id.* ¶ 46) and "paid off the Loan in full" (*id.* ¶ 41). According to Plaintiffs, at this time, "Community Bank and Phoenix had actual or constructive knowledge of WST's widespread fraud and the fraudulent nature of the underlying business venture funded by the Loan." (*Id.* ¶ 43.)

Rumson Wellness has "paid approximately $1.4 million for the Loan, and received no operational franchise or Equipment Collateral," which rendered the business worthless. (*Id.* ¶ 47.)

### B.    Procedural Background

Plaintiffs filed their original complaint on June 18, 2025 (Compl., ECF No. 1), and the operative Amended Complaint on July 10, 2025 asserting four causes of action against Defendants: (1) negligent misrepresentation ("Count One"); (2) breach of the implied covenant of good faith and fair dealing ("Count Two"); (3) unjust enrichment ("Count Three"); and (4) declaratory judgment ("Count Four") (Am. Compl. ¶¶ 52-78).

Defendants thereafter filed the instant Motion to Dismiss (Defs.' Mot. to Dismiss, ECF No. 23), Plaintiffs opposed (Pls.' Opp'n Br., ECF No. 26), and Defendants replied (Defs.' Reply Br., ECF No. 27).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure[2] 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

---

[2] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify "the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must identify all of the plaintiff's well-pleaded factual allegations, accept them as true, and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III.   DISCUSSION

Defendants move to dismiss Plaintiffs' Amended Complaint in its entirety. (*See generally* Defs.' Moving Br., ECF No. 23-1.) The Court addresses each claim in turn.

### A.   Negligent Misrepresentation—Count One

Defendants argue that the Amended Complaint fails to state a negligent misrepresentation claim because: (1) "Defendants, as lenders, did not owe Plaintiffs a duty of care as borrowers"; (2) "[t]he SBA SOPs do not provide a private right of action[,]" and, in any event, "Defendants complied with the SOPs"; (3) "[t]he economic loss doctrine bars Plaintiffs' negligent

misrepresentation claim"; and (4) the "claim should be dismissed . . . against Community Bank because it is a holder in due course entitled to protection under the [UCC]". (*Id.* at 9-25.)

Under New Jersey law, a claim of negligent misrepresentation requires a plaintiff to adequately allege that: (1) a defendant negligently made an incorrect statement; (2) the plaintiff justifiably relied on such a statement; and (3) the plaintiff sustained an injury as a result of that reliance. *Green v. Morgan Props.*, 73 A.3d 478, 493-94 (N.J. 2013) (quoting *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 142-43 (1983)). "A party asserting a negligent misrepresentation claim must [also adequately allege that] the defendant had a duty of care." *Princeton Neurological Surgery, P.C. v. Horizon Blue Cross Blue Shield of N.J.*, No. A-486-22, 2024 WL 178220, at *7 (N.J. Super. Ct. App. Div. Jan. 17, 2024). The Court first addresses whether Defendants owed Plaintiffs a duty of care.

New Jersey law is clear that when a contractual relationship exists between a lending bank and a borrower, the lender "does not owe a duty of care to a borrower, even if the borrower is a consumer." *Stolba v. Wells Fargo & Co.*, No. 10-6014, 2011 WL 3444078, at *5 (D.N.J. Aug. 8, 2011) (quoting *Shinn v. Champion Mortg. Co., Inc.*, 2010 WL 500410, at *4 (D.N.J. Feb. 5, 2010)); *see United Jersey Bank v. Kensey*, 704 A.2d 38, 45 (N.J. Super. Ct. App. Div. 1997) ("There is . . . a general presumption that the relationship between lenders and borrowers is conducted at arms-length, and the parties are each acting in their own interest." (citation modified)); *Lambs Lane Realty, LLC v. Lakeland Bank*, No. A-674-18T4, 2019 WL 1500903, at *6 (N.J. Super. Ct. App. Div. Apr. 4, 2019) ("A financial institution, acting within its conventional role as a lender of money, owes no duty of care to the borrower when preparing an appraisal of the borrower's collateral." (citation modified) (quoting *Kensey*, 704 A.2d at 47)).

8

In opposition to Defendants' Motion to Dismiss, Plaintiffs argue that their allegations "fall under *Kensey*'s 'second category of cases[,]'" and that "[a] duty of care arises when 'special circumstances' exist[.]" (Pls.' Opp'n Br. 16-17.) In support of this proposition, Plaintiffs cite *Kensey*'s explanation that "special circumstances may exist where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and relying on the bank . . . to counsel and inform him." (Pls.' Opp'n Br. 16 (citation modified) (quoting *Kensey*, 704 A.2d at 45).) Plaintiffs further cite *Kensey*'s explanation that "where a bank ha[s] actual knowledge of fraud being perpetrated upon a customer [and] enters into a transaction with that customer in furtherance of the fraud, it could be held liable for the resulting loss." (*Id.* at 17 (quoting *Kensey*, 704 A.2d at 46 (citation modified)).) Plaintiffs argue that representations that Fountainhead made on its website, such as describing itself as "a sophisticated SBA lending expert possessing 'extensive SBA loan experience' with a team that was the 'most well-known, awarded, and experienced . . . in the SBA industry' . . . created a relationship of trust and reliance" that rises to the level of special circumstances that created a duty of care.[3] (*Id.* (quoting Am. Compl. ¶ 27).)

The Court disagrees. This type of advertising on Fountainhead's website does not rise to the level of special circumstances contemplated by *Kensey*. *See Kensey*, 704 A.2d at 44-48 (discussing examples of cases that fall into the special circumstances category that gave rise to

---

[3] Plaintiffs also cite *Donnelly v. Branch Banking & Trust Company*, 971 F. Supp. 2d 495 (D. Md. 2013) and *Jacques v. First Nat'l Bank of Maryland*, 515 A.2d 756, 758 (Md. 1986), to support the proposition that dismissal here is premature. (Pls.' Opp'n Br. 18.) These cases, however, are distinguishable. In *Jacques*, the bank made two promises to plaintiffs and *had knowledge* that plaintiffs "would be legally obligated to either proceed to settlement with the loan . . . or forfeit their deposit of $10,000[] and lose any benefit of their bargain." *Jacques*, 515 A.2d at 761, 763 (emphasis added). While the court in *Donnelly* found that it was premature to conclude that the bank did not owe plaintiffs a duty of care, the bank in *Donnelly* made specific representations about a specific complex transaction involving plaintiffs that do not exist here. *See Donnelly*, 971 F. Supp. at 507-08.

lending banks' duty of care to a borrower where banks "actively encouraged the plaintiff to rely upon [the banks'] advice and [the banks] concealed [their] self-interest in promoting the transaction[s] involved"). Here, however, Plaintiffs do not allege that Fountainhead had actual knowledge of the fraudulent actions of WST or that Defendants ever gave Plaintiffs advice let alone actively encouraged Plaintiffs to rely on Defendants' advice. (*See generally* Am. Compl.)[4] The Amended Complaint, rather, alleges that Defendants were negligent in failing to detect the fraud as part of its "due diligence" in vetting the loan. (*See* Am. Compl. ¶¶ 53-56.) The Amended Complaint does not allege that Defendants "actively encouraged the [p]laintiff[s] to rely upon [their] advice [or] concealed [their] self-interest in promoting the transaction involved." *Kensey*, 704 A.2d at 46-47.

Plaintiffs, as the franchisee, moreover, did not discover the fraud on their own although they: (1) spent significant time with Wear; and (2) "performed [their own] due diligence, including reference checks, speaking to current franchisors, physically examining the technology of water vending machines installed for other franchise owners, and scouting locations of current and potential future water vending machines both nationwide and internationally." (Am. Compl. ¶ 19.) These allegations do not support the plausible inference that Plaintiffs' relationship with Defendants rose to the level of a special circumstance in which Plaintiffs were relying on the bank to vet the WST franchise because Plaintiffs allege that they actively vetted WST themselves. (*See*

---

[4] While Plaintiffs allege that Community Bank and Phoenix had actual or constructive knowledge of WST's fraud in April of 2025, when Community Bank and Phoenix enforced payment of the Loan (Am. Compl. ¶¶ 41-46), Plaintiffs do not allege that Community Bank or Phoenix made any misrepresentations or gave Plaintiffs any advice upon which they relied (*see generally id.*); *Abira Med. Lab'ys, LLC v. Allied Benefit Sys., LLC*, No. 23-4002, 2025 WL 278651, at *5 (D.N.J. Jan. 23, 2025) (dismissing plaintiffs' negligent misrepresentation claim because plaintiffs "did not sufficiently allege that [d]efendants made any promises or misrepresentations").

*id.*) There are also no allegations that Defendants made any representation that they would discover fraud, or that WST was not committing fraud. (*See generally id.*)

Because the Court finds that Plaintiffs failed to adequately allege the existence of "special circumstances," Plaintiffs have failed to sufficiently plead that Defendants, a lending bank, owed a duty to Plaintiffs and Plaintiffs have therefore failed to state a negligent misrepresentation claim.[5] *United Cap. Funding Grp., LLC v. Remarkable Foods, LLC*, No. 21-3291, 2022 WL 2760023, at *4 (D.N.J. July 14, 2022) (dismissing plaintiff's negligent misrepresentation claim because plaintiff failed to plausibly allege that defendant owed plaintiff a duty "separate from what the defendant owes . . . plaintiff under [the parties'] contract"); *Marias v. Bank of Am., N.A.*, No. 14-4986, 2015 WL 4064780, at *4 (D.N.J. July 1, 2015) (dismissing plaintiffs' negligence claims against a lending bank because, among other things, plaintiffs could not "establish as a matter of law that" the lending bank owed them, as borrowers, a duty of care); *Ramos v. Wells Fargo Bank, N.A.*, No. 16-880, 2016 WL 6434423, at *12 (D.N.J. Oct. 31, 2016) (dismissing plaintiff's negligence claim because "New Jersey law is clear that when the contractual relationship is

---

[5] While Plaintiffs do not argue that the SBA SOPs create an independent duty of care or private right of action (*see* Pls.' Opp'n Br. 19), Plaintiffs contend that Fountainhead failed to comply with the SBA SOPs at the time of the Loan's execution (*id.* at 19-20). Such a failure, however, does not rise to the level of special circumstances required to create a duty that Defendants, a lending bank, owed to Plaintiffs as borrowers. *See, e.g.*, *Kensey*, 704 A.2d at 44-48 (discussing examples of cases that fall into the special circumstances category where lending banks "actively encouraged the plaintiff [borrowers] to rely upon [their] advice and concealed [their] self-interest in promoting the transaction[s] involved"). Moreover, Plaintiffs' allegations do not give rise to a plausible inference that Defendants knew or had reason to know that Plaintiffs were "placing [their] trust and confidence in the bank and relying on the bank so to counsel and inform" them about the transaction. *See id.* at 45.

Additionally, because the Court finds that Plaintiffs failed to adequately allege that Defendants owed Plaintiffs a duty of care, it does not reach Defendants' other arguments made in support of dismissing this claim.

between a lending bank and a borrower, the lender 'does not owe a duty of care to the borrower'" (citation omitted)).

The Court therefore dismisses Count One of the Amended Complaint.

**B.      Breach of Implied Covenant of Good Faith and Fair Dealing—Count Two**

Defendants argue that Plaintiffs' breach of implied covenant of good faith and fair dealing claim should be dismissed because: (1) there is no contractual provision in the Loan Agreement that applies to Plaintiffs' claim; (2) "the 'necessary due diligence' actions Plaintiffs claim Fountainhead failed to conduct . . . are all pre-contract actions (or non-actions) that cannot support a good faith and fair dealing claim"; (3) "Plaintiffs fail to allege any facts which would show that Defendants acted with improper motive"; and (4) Community Bank and Phoenix were entitled to enforce the loan[,]" which was the benefit of their bargain." (Defs.' Moving Br. 29-35.)

Plaintiffs argue in opposition that they have alleged several post-closing actions taken by Defendants to support their breach of good faith and fair dealing claim and that these actions go to the "spirit and purpose" of the agreement. (Pls.' Opp'n Br. 28-33.)

"In New Jersey, '[e]very contract contains an implied covenant of good faith and fair dealing.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 348 (3d Cir. 2022) (alteration in original) (quoting *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002)). "The implied covenant prohibits either party from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997)). "To make out a claim for breach of the covenant, '[a] plaintiff must . . . [allege] the defendant's bad motive or intention.'" *Riachi v. Prometheus Grp.*, 822 F. App'x 138, 141-42 (3d Cir. 2020) (quoting *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007)); *see also Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 287-90

12

(3d Cir. 2000) (finding no breach of the implied duty of good faith when plaintiffs failed to allege any misconduct or omissions in bad faith).

Here, Plaintiffs fail to adequately allege that Defendants breached the implied covenant of good faith and fair dealing because Plaintiffs have not sufficiently alleged any bad motive or intention on Defendants' part. (*See generally* Am. Compl.); *Riachi*, 822 F. App'x at 141-42. Plaintiffs allege that the purpose of the Loan Agreement was the "long term financing for the start-up operations of a [WST] Franchise Business." (Am. Compl. ¶ 18.) Plaintiffs also allege that Defendants "acted in bad faith with the intent to deprive Plaintiffs of the Loan's . . . benefits" which was "a functioning WST franchise capable of generating revenue to repay the Loan." (*Id.* ¶ 62.) These allegations, however, are threadbare recitals and mere conclusory statements that are unsupported by any factual allegations which are insufficient to state a claim. *Nelson v. Redick*, No. 24-1087, 2024 WL 3177774, at *1 (3d Cir. June 26, 2024) (quoting *Iqbal*, 556 U.S. at 678); *Signet Media, Inc. v. LG Elecs. MobileComm, U.S.A., Inc.*, No. 24-4441, 2025 WL 3140917, at *11 (D.N.J. Nov. 10, 2025) (dismissing plaintiff's breach of duty of good faith and fair dealing claim where plaintiff made only conclusory allegations regarding defendants' conduct).

Plaintiffs allege that Defendants: (1) accepted a delayed list of Equipment Collateral; (2) did not verify the Equipment Collateral; (3) did not perform site visits or UCC-1 services; and (4) enforced the loan after WST's fraud was discovered. (Am. Compl. ¶¶ 20-22, 31, 41-45, 47.) The Amended Complaint makes clear, however, that the frustration of the Loan's purpose was the Ponzi scheme that was orchestrated by WST—who is not a party in this action—and not any actions by Defendants. (*See generally id.*) Plaintiffs, moreover, have not alleged facts to give rise to the inference that Defendants acted in bad faith with the objective of preventing Plaintiffs from receiving the benefit of a fully funded WST franchise, and have thus failed to state a claim. (*See*

*generally id.*); *see also Kruse v. JP Morgan Chase Bank, N.A.*, No. 23-4530, 2024 WL 3912982, at *10 (D.N.J. Aug. 23, 2024) (dismissing plaintiff's breach of the implied covenant of good faith and fair dealing claim because plaintiff failed to allege facts to indicate that defendants acted "in bad faith, with the objective of preventing [p]laintiff from receiving his benefits of protection under the relevant" contracts); *Jannarone v. Sunpower Corp.*, No. 18-9612, 2019 WL 4058981, at *7 (D.N.J. Aug. 28, 2019) (dismissing plaintiff's breach of good faith and fair dealing claims because plaintiff did not allege, among other things, bad intention on the part of defendant); *see also Block v. Jaguar Land Rover N. Am., LLC*, No. 15-5957, 2016 WL 3032682, at *6 (D.N.J. May 26, 2016) (dismissing plaintiffs' breach of good faith and fair dealing claim because, among other things, they did "not plead sufficient facts to make plausible a claim that [defendant] acted *with the objective of preventing* [p]laintiffs from receiving their reasonably expected fruits under the contract") (emphasis added)).

The Court therefore dismisses Count Two of the Amended Complaint.

### C.    Unjust Enrichment—Count Three

Defendants argue that the "remuneration" Plaintiffs claim to have expected to receive in return were expected to come from a non-party, WST, not Defendants, and Defendants, therefore, did not deny Plaintiffs anything. (Defs.' Moving Br. 35-37.) Defendants also argue that Plaintiffs have not alleged that Defendants received anything other than the benefit of their bargain. (*Id.* at 37.) In opposition, Plaintiffs argue that the Loan Agreement is a void contract "because of the WST fraud[,]" that the Loan would have never been approved or funded had Defendants conducted appropriate diligence, and therefore Plaintiffs have stated an unjust enrichment claim. (Pls.' Opp'n Br. 33-35.)

New Jersey law provides for a claim for unjust enrichment "where the plaintiff has, under false auspices, conferred a benefit on the defendant." *Ho-Ho-Kus, Inc. v. Sucharski*, No. 23-1677, 2023 WL 7403539, at *14 (D.N.J. Nov. 9, 2023). To state such a claim for unjust enrichment, plaintiffs must adequately allege that: "(1) the 'defendant[s] received a benefit' from the plaintiff[s]; (2) 'retention of that benefit [by the defendants] without payment would be unjust'; (3) plaintiff[s] 'expected remuneration from defendant[s] at the time [they] performed or conferred a benefit on defendant[s]'; and (4) the 'failure of remuneration enriched [the] defendant[s] beyond [their] contractual rights.'" *Semeran v. Blackberry Corp.*, No. 15-750, 2016 WL 406339, at *6 (D.N.J. Feb. 2, 2016) (quoting *VRG Corp. v. GKN Realty Co.*, 641 A.2d 519, 526 (N.J. 1994)). Under New Jersey law, moreover, "[w]here there is an express contract covering the identical subject matter of the claim, plaintiff[s] cannot pursue a quasi-contractual claim for unjust enrichment." *Gaviria v. Lincoln Educ. Servs. Corp.*, No. 20-18552, 2021 WL 5404971, at *7 (D.N.J. Nov. 3, 2021) (citation omitted).

Here, while Plaintiffs allege that Defendants received a benefit from Plaintiffs (the $1.4 million loan payoff) (Am. Compl. ¶ 47), Plaintiffs have failed to adequately allege that they did not receive an expected remuneration from Defendants (*see generally id.*). Defendants performed the only remuneration that Plaintiffs were entitled to from Defendants, which was the funding of the Loan. (*Id.* ¶ 18.) The rest of the remuneration that Plaintiffs allege they failed to receive was on the part of WST. (*See generally id.*) Plaintiffs, accordingly, fail to state an unjust enrichment claim. *See McCray v. Sanders*, No. 20-12370, 2022 WL 3868058, at *9 (D.N.J. Jan. 21, 2022) (dismissing plaintiffs' unjust enrichment claim because, among other things, plaintiffs did not sufficiently allege expected remuneration from defendant); *Katz v. Ambit Ne., LLC*, No. 20-1289,

15

2023 WL 2570147, at *3-4 (D.N.J. Mar. 20, 2023) (same); *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 754-55 (D.N.J. 2013) (same).

The Court therefore dismisses Count Three of the Amended Complaint.

### D.    Declaratory Relief—Count Four

Defendants argue that Plaintiffs' declaratory judgment count should be dismissed because the underlying causes of action fail as a matter of law. (Defs.' Moving Br. 38-39.)

"Declaratory relief is a remedy, not a cause of action." *DeCozen Chrysler Jeep Corp. v. Fiat Chrysler Autos., LLC*, No. 22-68, 2025 WL 822995, at *5 (D.N.J. Mar. 13, 2025) (citing *Kabbaj v. Google Inc.*, 592 F. App'x 74, 75 n.2 (3d Cir. 2015). A plaintiff "may seek a declaratory judgment as a remedy in connection with one or more of its substantive claims." *Hobson v. Hartford Ins. Co. of the Midwest*, No. 21-20696, 2022 WL 4536470, at *6 (D.N.J. Sep. 28, 2022). Because the Court has dismissed each of Plaintiffs' substantive claims against Defendants, it also dismisses Plaintiffs' declaratory judgment claim against Defendants. *Graber v. Westfield Ins. Co.*, No. 21-3313, 2024 WL 3927211, at *6 (E.D. Pa. Aug. 23, 2024) (dismissing plaintiff's declaratory judgment claims because it dismissed plaintiff's underlying substantive claims); *Raciti v. Rushmore Loan Mgmt. Servs., LLC*, 412 F. Supp. 3d 462, 472 (D.N.J. 2019) (same).

## IV.    CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss is granted. The Court will issue an Order consistent with this Memorandum Opinion.

*/s/ Michael A. Shipp*
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

DATED: APRIL 28, 2026

16